## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FLAGSTAR BANK, FSB, a federally
chartered savings bank

        CASE NO. 05-70950

     Plaintiff,                  HON. LAWRENCE P. ZATKOFF

v.

FEDERAL INSURANCE COMPANY, an
Indiana Corporation and CONTINENTAL
CASUALTY COMPANY, an Illinois
Corporation.

     Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on November 17, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court upon Defendant Federal Insurance Company's ("Federal")

Motion for Summary Judgment (Docket # 137). Federal filed its motion on September 1, 2006, and,

per the parties' stipulation, Plaintiff Flagstar Bank, FSB ("Flagstar") responded on October 2, 2006.

Federal has since replied. The Court finds that the facts and legal arguments are adequately

presented in the parties' papers and the decision process would not be significantly aided by oral

argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion

be resolved on the briefs submitted. For the following reasons, Federal's Motion for Summary

Judgment will be GRANTED.

## II.  BACKGROUND

### A.  Flagstar and Mortgage Warehousing

Flagstar is a federally chartered savings bank that is in the commercial lending business. Part of Flagstar's lending business involves mortgage warehousing, a form of secured lending in which a commercial bank, the warehouse lender, advances funds to a mortgage banker on a short-term basis. In mortgage warehousing, commercial banks extend a revolving line of credit to mortgage bankers. The mortgage bankers then use the funds advanced under the revolving line of credit to close and record mortgages in their own names, pledging the secured mortgage notes as collateral with the commercial banks. (*See* 2 MADISON, DWYER & BENDER, THE LAW OF REAL ESTATE FINANCING § 11:7). "Thereafter, the commercial banks, hold onto or warehouse the mortgage loans until they are reassigned and sold to a permanent lender." (*Id.*). Once a permanent lender purchases the underlying mortgages, the commercial banks' advances are repaid.

In 2003, Flagstar entered into a warehousing credit agreement with Amerifunding/Amerimax Realty Group, Inc. ("Amerifunding"), and approved a $20 million line of credit. (*See* Pl.'s Compl. ¶ 7). From February through March 2004, Flagstar advanced funds pursuant to the agreement in connection with 39 residential mortgage transactions. (*See id.* ¶ 13; Pl.'s Ex. O). To obtain an advance, Flagstar required Amerifunding to submit (1) an advance request; (2) an executed promissory note and mortgage; (3) an assignment of the note; and (4) written confirmation of a pre-arranged investor's commitment to purchase the loan upon closing. (*See* Pl.'s Ex. F). Upon receipt of these documents, Flagstar's loan processor would confirm that the documents were complete, and Flagstar would advance funds equal to 99% of the face value of each promissory note. (*See id.* ¶ 8). Rather than advancing the funds directly to Amerifunding, Flagstar would advance the funds to a

title company, in this case Security National Title Company ("Security National"), which would hold the funds in escrow pending the closing date. In each of the transactions involved in the present suit, the same permanent investor, TDF Mortgage Funding ("TDF"), purportedly agreed to purchase the mortgages. As result of the 39 transactions in February and March 2004, Amerifunding owed Flagstar $19,174,553. (*See id.* ¶ 20). However, as will be discussed below, the underlying mortgage transactions never took place and the promissory notes Amerifunding submitted in order to procure advances bore forged signatures.

## B.  Federal and the Financial Institution Bond

Federal is an Indiana insurance company and is part of a larger group of insurers that provides a wide range of policies for various types of risks. One of Federal's specialties involves insuring financial institutions, such as Flagstar, against employee dishonesty, computer crime, fraud, and extortion. In 2003, Federal issued a $10 million Financial Institution Bond ("the Bond") that insured Flagstar against certain losses during 2004. In addition, Flagstar obtained a $15 million excess bond for the same period from Continental Casualty Company.[1] The excess bond was subject to the same terms and conditions as the underlying Bond and insured Flagstar for those losses above $10 million.

The Bond was modeled after the Standard Form 24 Financial Institution Bond, which is promulgated by the Surety Association of America ("SAA"). "The Financial Institution Bond, which until 1986 was known as the 'bankers blanket bond' ... is ... a two-party agreement between the underwriter and the insured financial institution, pursuant to which the underwriter agrees to

---

[1] Continental Casualty Company is also a defendant in this suit. On August 9, 2006, the Court granted Continental summary judgment on the issue of damages. *See* Docket # 129. Consequently, Continental is not a party to this motion.

indemnify the insured against loss sustained by reason of specific perils described under six 'Insuring Agreements ....'" Peter I. Broeman, *An Overview of the Financial Institution Bond, Standard Form 24*, 110 BANKING L. J. 439, 439-40 (1993). Generally, these Insuring Agreements "protect the insured financial institution against loss directly caused by specified acts ...." (*Id.* at 440). The bond also consists of six general agreements and twelve conditions and limitations, which must be read together with the Insuring Agreements, as well as any definitions and exclusions that may apply to the facts of each case. (*See id.*).

The Standard Form 24 has its roots in underwriting agreements developed by Lloyd's of London, and first marketed in the United States in 1911. (*See id.* at 442). The first American Standard Form Bond was produced in 1916. (*See id.*). Over the last 90 years, the Standard Form Bond has undergone numerous revisions, the last being in 1986, "in order to incorporate commonly used riders, to clarify insuring agreements and to adjust the bond to conform with modern banking practices." (*Id.* at 443) (internal quotations omitted). Among the changes, the SAA renamed the bond from a bankers blanket bond to a financial institution bond to deter courts from interpreting coverage as broader than intended by the parties. (*See id.* at 444).

Insuring Agreement (D) of the Standard Form Bond protects against: "Loss resulting directly from: Forgery ... on or in any Negotiable Instrument (except an Evidence of Debt) ...." (*Id.* at 454). Furthermore, the Section 2(e) loan loss exclusion states that the bond "does not cover loss resulting directly or indirectly from ... non-payment of ... any loan ... whether such loan ... was procured in good faith or through ... fraud ... except when covered under Insuring Agreements (A), (D), or (E)." (*See* Pl.'s Ex. H).

Despite several differences, the relevant provisions of the Bond in the present case are

4

substantively the same as the Standard Form 24 bond. Like the standard bond, Insuring Clause 4 in the present Bond protects against: "Loss resulting directly from: Forgery on ... any Negotiable Instrument (other than an Evidence of Debt) ...." (Def.'s Ex. J). Moreover, the Bond's Section 4 loan loss exclusion, which applies to all Insuring Clauses except clauses 1, 4, and 5, states that the Bond "does not directly or indirectly cover: loss resulting from the complete or partial non-payment of or default on any Loan whether such Loan was procured in good faith or through trick, artifice, fraud or false pretenses ...." (*Id.*).

## C.  The Amerifunding Scheme and Federal's Denial of Coverage

In late 2003, Flagstar assigned Julie Eisenhauer as the processor for Amerifunding's account. (*See* Def.'s Ex. G at 34-35). Shortly after her assignment, Eisenhauer began to notice similarities between the handwriting on Amerifunding's requests for advances and the signatures on the deeds and mortgage notes submitted by Amerifunding. (*See id.*). The similarities caused Eisenhauer to have a high suspicion that the Amerifunding notes were forged. (*See id.*). As a result, Joe Lathrop, who was in charge of Flagstar's warehouse lending department during the relevant time period, began requiring Amerifunding to produce the underlying borrowers' driver's licenses. However, after comparing the signatures on the mortgage documents with the signatures on the driver's licenses, Eisenhauer believed that the documents were forged by simply tracing the signatures on the licenses. (*See id.* at 86-87).

Subsequently, Eisenhauer and her supervisor, Sharol Perez, decided to investigate Amerifunding's transactions and the title company it used to close the transactions, Security National. On January 12, 2004, Eisenhauer attempted to find information about Security National through directory assistance and the internet, but was unsuccessful. (*See id.*). Furthermore, in

response to an email Eisenhauer sent to Security National, the title company refused to disclose any information about itself. (*See id.* at 59-60). Perez also attempted to find information about Security National, but was also unsuccessful. (*See* Def.'s Ex. I). In a conversation with a Flagstar correspondent in the Denver area, First Funding Financial, Perez learned that Security National had not been in business for at least seven years. (*See id.* at 58-59).

After failing to obtain information about Security National, Eisenhauer decided to contact the recorders of deeds in the counties where the mortgage transactions purportedly took place. The recorders offices informed Eisenhauer that they did not have any record of documents being recorded in relation to the mortgage transactions Flagstar had financed. (*See* Def.'s Ex. G at 82-83). Finally, Eisenhauer contacted one of the underlying borrowers, Jeffery Hood, who denied applying for a loan or signing a promissory note. (*See id.* at 117-20).

In mid-March 2004, as a result of Eisenhauer's investigation, Flagstar learned that the underlying mortgage transactions which Amerifunding submitted as collateral for advances under its line of credit were completely fictional. (*See* Def.'s Ex. F). Amerifunding and Security National were in fact controlled by the same group of people. (*See id.*). Through the use of stolen identities, Amerifunding would manufacture fake mortgage documents and promissory notes bearing forged signatures, and submit them to Flagstar for advances on the line of credit. (*See id.*). Amerifunding also created the permanent investor, TDF, that it represented as the end investor for all of the 39 transactions involved in this case. (*See id.*). Pursuant to its warehouse lending procedure, once Flagstar obtained the advance request, mortgage documents, and permanent investor information, it would advance the funds to Security National, which, instead of using the funds to close a real estate sale, would disburse the funds to the individual perpetrators of the fraud. (*See id.*).

6

Amerifunding would then apply part of the advances to pay off some of its debt to Flagstar in order to give the appearance that TDF had purchased the loans and real transactions had taken place. (*See id.*). By the time Flagstar discovered the fraud it was owed approximately $23 million. (*See id.*). Flagstar immediately contacted the FBI and sued Amerifunding and others for the fraud. (*See id.*).

Thereafter, Flagstar made a claim against Federal pursuant to the Bond, alleging that it incurred a loss of $19,174,553 as a result of forgeries on 39 of the promissory notes submitted by Amerifunding. All of the notes were identical in form. Flagstar provided the initial notice of the loss to Federal on March 23, 2004. (*See* Pl.'s Ex. A). Federal then acknowledged receipt of the notice, classified the claim as one involving forgery, and requested a proof of loss. (*See* Pl.'s Ex. B). Flagstar submitted its proof of loss on June 11, 2004. (*See* Pl.'s Compl. ¶ 19). On July 28 and 30, 2004, Federal informed Flagstar that it had determined that Flagstar's claim was not covered under the Bond, believing there to be a causation issue. (*See* Pl.'s Ex. C). Specifically Federal did "not believe that the alleged forgeries [were] the cause of the loss." (*Id.*).

Unsatisfied with this conclusion, Flagstar filed a supplemental proof of loss on September 1, 2004, which provided additional information regarding causation. (*See* Pl.'s Ex. D). Flagstar explained that it would not have advanced the funds to Amerifunding without first receiving the signed promissory notes. (*See id.*). Following the submission of the supplemental proof of loss, Federal hired a forensic accountant to investigate Flagstar's claim. (*See* Pl.'s Ex. E at 3). After a full investigation of the claim, Federal again concluded that Flagstar's loss was not covered because it would have sustained the same loss had the notes contained genuine signatures. (*See id.*). After having its claim denied for a second time, Flagstar commenced the present suit, alleging Federal breached its agreement under the Bond and claiming over $19 million in damages.

7

### III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005); *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). *See Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249 (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. PRO. 56(e); *Celotex*, 477 U.S. at 324. Thus, the nonmoving party must do more than simply show that there is some

8

metaphysical doubt as to the material facts; it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *See Matsushita*, 475 U.S. at 586; *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003); *Gaines v. Runyon*, 107 F.3d 1171, 1174-75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *accord Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005).

## IV. ANALYSIS

Federal's principal argument concerns the issue of whether Flagstar's loss resulted directly from the forged signatures on the 39 promissory notes submitted by Amerifunding.[2] According to this argument, Flagstar's loss did not result directly from the forgeries, but rather resulted because the collateral for Flagstar's advances to Amerifunding turned out to be worthless. In other words, even if the signatures on the promissory notes were genuine, Flagstar would have still experienced the same loss because it had no collateral. Federal asserts that there is no genuine issue of fact that Flagstar's collateral had no value.

In response to this argument, Flagstar urges the Court to construe the phrase "resulting directly from" in the Bond to mean "proximately caused by." Flagstar does not present factual evidence to rebut Federal's contention that the underlying collateral for the warehouse line of credit was nonexistent. Instead, Flagstar argues that the forgeries caused its loss because it would not have

---

[2]Federal also argues that the notes in this case do not qualify for coverage under the terms of the Bond because they are not negotiable instruments as the term is defined in the Bond. Further Federal contends that even if the notes were negotiable instruments, they would not qualify for coverage because they are evidence of debt and are excluded from Insuring Clause 4. The Court will not address the merits of these arguments, but will assume that the notes at issue are negotiable instruments and are not evidence of debt for the purposes of this motion. The Court will also assume that all of the notes contained a forgery as defined in the Bond.

advanced the funds to Amerifunding had it not received the promissory notes bearing forged signatures. Essentially, Flagstar disagrees that a finding that the collateral was worthless compels the Court to conclude that the forgeries on the notes did not cause its loss. For the following reasons, the Court concludes that Flagstar's loss did not result directly from the forgeries in the promissory notes as contemplated by the Bond and, therefore, Federal's Motion for Summary Judgment will be GRANTED.

**A.  Coverage under Flagstar's Bond**

The Bond involved in this case is entitled Financial Institution Bond Form A. *See* Def.'s Ex. J. According to the parties, this Bond is modeled after the Standard Form 24 Financial Institution Bond, which is the bond discussed in the case law presented by the parties. Flagstar's Bond provides coverage for losses arising in twelve specific situations, called insuring clauses. "No recovery is possible under these insuring agreements without an insured showing that it had a legally cognizable interest in assets which were misappropriated, or were measurably lessened in value, as a direct result of facts established by the insured." Peter Haley, *Loss and Causation*, *in* ANNOTATED FINANCIAL INSTITUTION BOND 99 (Michael Keeley ed., 2d ed. 2004).

Flagstar claims that the loss it sustained in connection with the Amerifunding scheme is covered under Insuring Clause 4 of the Bond. Insuring Clause 4 insures Flagstar against "Loss resulting directly from: Forgery on ... any Negotiable Instrument (other than an Evidence of Debt) ...." Def.'s Ex. J. Insuring Clause 4 in Flagstar's Bond is substantively identical to Insuring Agreement (D) of the Standard Form 24 Financial Institution Bond.

In addition to the twelve insuring clauses, the Bond narrows the scope of the coverage though numerous conditions and limitations. The fourth of these conditions and limitations, the loan

loss exclusion, is "Applicable To All Insuring Clauses Except Insuring Clauses 1., 4. And 5." and states in pertinent part: "This bond does not directly or indirectly cover: (a) loss resulting from the complete or partial non-payment of or default on any Loan whether such Loan was procured in good faith or though trick, artifice, fraud or false pretenses ...." *Id.* This exclusion is analogous to the loan loss exclusion 2(e) in the Standard Form 24 Financial Institution Bond. When read as a whole, the Bond excludes coverage for losses resulting from non-payment of loans, even if a forgery is involved, unless the insured can demonstrate that its loss meets the specific requirements of Insuring Clauses 1, 4, or 5. *See Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F.Supp. 860, 865 (D. N.J. 1983). Therefore, in this case, Flagstar has the burden to demonstrate that its loss meets all of the requirements of Insuring Clause 4.

At issue in this case is whether Flagstar can prove its loss resulted directly from the forged signatures in the promissory notes submitted by Amerifunding. Federal argues that Flagstar's loss did not result from the forgeries, but from the fact that the underlying transactions represented by the notes never took place, rendering Flagstar's collateral worthless. Since the forgeries were not the direct cause of the loss, Federal argues that Flagstar's claim is not covered by the bond. In contrast, Flagstar claims that because it would not have released funds to Amerifunding if the signatures were not present, its loss resulted directly from the forgeries. In order to resolve the issue the Court must determine whether Flagstar's collateral was, as Federal contends, fictional and, if so, whether this prevents the forgeries from being considered the direct cause of Flagstar's loss as contemplated by the Bond.

## B. Flagstar's Collateral

The fact that the underlying mortgage transactions which were the basis for Flagstar's

11

collateral never existed is well documented. The basis for Flagstar's claims against Amerifunding, its title company, and its principals, is the fact that they perpetrated a fraud on Flagstar by creating fictitious mortgage transactions. *See* Def.'s Ex. B ¶¶ 9, 25, 32, 34, 36; C ¶ 16, 68. Flagstar's general counsel has explained that the underlying mortgage transactions never existed. *See* Def.'s Ex. L at 15-21. It was his understanding that none of the advances involved in the present suit were in connection with a valid loan and mortgage transaction. *See id.* Moreover, he acknowledged that the promissory notes at issue in the present case were not executed in connection with real loan transactions. *See id.* Although the forged signatures were the names of actual persons, Flagstar admits that none of them actually applied for a mortgage from Amerifunding, and the promissory notes did not represent legitimate real estate transactions. *See* Def.'s Ex. E; M at 55-56.

Furthermore, in Flagstar's original proof of loss, it stated that "the mortgage transactions in truth were merely shams–no homes were bought with the funds, a legitimate permanent lender never bought or approved the loans and a legitimate title company never held the funds in escrow." Def.'s Ex. F at 2. Flagstar's loan processor eventually investigated the title company but could not locate it on the internet or through directory assistance. *See* Def.'s Ex. G at 59-60. Another employee also sought information about the title company and discovered that it had not been in business for at least seven years. *See* Def.'s Ex. I at 58-59. Moreover, an inquiry with the recorders of deeds for the counties in which the purported transactions took place revealed that there were no records of any transaction. *See* Def.'s Ex. G at 82-83.

In response to Federal's showing, Flagstar offers evidence indicating that it valued and relied on the notes submitted by Amerifunding. For example, Flagstar offers its policy for advancing funds, which states the "minimum collateral required for each Advance made pursuant to the Mortgage

12

Warehousing and Security Agreement ... shall be ... : the duly executed Mortgage Note made by the borrower ... having a Credit Value not less than the amount of the Requested Advance." *See* Pl.'s Ex. F. The policy goes on to explain that Flagstar will not advance funds until it has the note in its possession. *See id.*; Pl.'s Ex. R at 42, 53. To Flagstar, the notes were very crucial to the transaction, and were treated "as if they were gold." Pl.'s Ex. R at 270-274; S at 106, 335.

Based on the evidence presented, the Court concludes that there is no genuine issue of fact that Flagstar's collateral had no value. Federal has come forward with numerous statements all indicating that the underlying mortgage transactions never took place and were perpetrated through the use of stolen identities. Amerifunding used the stolen identities to create fictional mortgage transactions in order to obtain advances on its line of credit from Flagstar. Flagstar held the mortgage notes and documents as collateral for the advances until the loans could be bought by an end investor. However, there was never an end investor: Amerifunding created and used the same fictional end investor for each of the fraudulent transactions. Instead of a real investor buying the loan and reimbursing Flagstar, Amerifunding would simply manufacture new mortgages and apply some of the proceeds from those advances to pay off the previous debt to Flagstar. This gave the appearance that Amerifunding was actually funding mortgages. Since the notes and mortgage documents that Flagstar held as collateral did not represent real transactions, Flagstar did not hold anything of value to secure its advances. The notes were not backed up by an actual interest in real estate and were themselves not real promises to pay money as a result of a loan.

Flagstar does not contest these facts. Instead, Flagstar's evidence merely demonstrates that it considered the notes valuable. Flagstar's written lending policy and its employees' depositions clearly show that Flagstar would not advance funds unless it possessed the mortgage notes for each

transaction. However, this evidence at most proves that Flagstar considered the notes to be important; it does not show that the notes had any real worth. Just because Flagstar thought the notes were as good as gold does not change the fact that the notes had no potential to secure Flagstar's advances. Therefore, Flagstar's evidence fails to raise a genuine issue of material fact regarding the value of its collateral in light of Federal's showing that the underlying mortgage transactions never took place and the mortgage notes did not represent real transactions or promises.

Flagstar only contends that in addition to the reality that the collateral was worthless, the forgeries contained in that collateral also contributed to its loss. Having determined that the collateral in the present case was worthless, the remaining issue is whether this finding requires the conclusion that Flagstar's loss did not result directly from the forgeries on the Amerifunding notes.

## C. Causation Under the Bond and Worthless Collateral

The relevant issue here is whether Flagstar has shown, "assuming all other coverage requirements have been met, a direct loss, that is a direct connection between the established facts and its claimed economic harm." Haley, *Loss and Causation*, *supra* at 100. Determining causation under financial institution bonds is policy driven, and "all cases on point hold that an Insured must prove more than causation in fact." *Id.* "It is not enough to show that 'but for' an act of covered forgery, for example, the insured would not have sustained 'Loss.'" *Id.* Rather, "[i]n the parlance of securities litigation, the insured must show *both 'transaction causation' and 'loss causation.'*" *Id.* (emphasis added). Therefore, Flagstar must show more than the fact the forgeries caused it to enter into the transactions with Amerifunding; it must also show that these forgeries directly caused its loss. *See id*; Peter C. Haley, *Paradigms of Proximate Cause*, 36 TORT & INS. L. J. 147, 162-64 (2000).

14

The parties have presented cases addressing the issue of causation with divergent results. Federal's cases, on the one hand, stand for the proposition that financial institution bonds do not cover losses where credit is given based on fictional collateral. *See KW Bankshares, Inc. v. Syndicates of Underwriters at Lloyd's*, 965 F.Supp. 1047 (W.D. Tenn. 1997); *French American Banking Corp. v. Flota Mercante Grancolombiana*, 752 F.Supp. 83 (S.D. N.Y. 1990); *Liberty Nat'l Bank*, 568 F.Supp. 860; *Georgia Bank & Trust v. Cincinnati Ins. Co.*, 538 S.E.2d 764 (Ga. App. 2000). On the other hand, Flagstar's cases seemingly stand for the proposition that coverage is available where a forged document caused the lending institution to enter into the fateful transaction. *See Jefferson Bank v. Progressive Cas. Ins*. Co., 965 F.2d 1274 (3rd Cir. 1992); *Omnisource Corp. v. CNA/Transcontinental Ins. Co.*, 949 F.Supp. 681 (N.D. Ind. 1996); *First Federal Savings Bank of Newton Kansas v. Continental Cas.  Co.*, 768 F.Supp. 1449 (D. Kan. 1991). While these lines of cases seem to clash, only Federal's cases reconcile the contractual language in each case with the economic realities of the transactions at issue and the purpose of the financial institution bond.

The court in *Liberty Nat'l*, addressed the issue of whether a financial institution bond provided coverage for losses when the insured extended credit based on worthless collateral. In *Liberty Nat'l*, the plaintiff made two loans to a debtor secured by certificates of deposit ("CDs") purportedly issued by a bank, the National Bank of Commerce, Ltd. ("NBC"), that was chartered in the British West Indies. *See Liberty Nat'l*, 568 F.Supp. at 861. Shortly after the bank was chartered, the debtor and several others manufactured CDs purportedly issued by the bank to the debtor, which also bore the forged signature of NBC's president. *See id.* The debtor then presented the CDs, in the amount of $50,000 and $75,500, respectively, to the plaintiff in order to procure a loan in the amount of $112,500. *See id.* When the loans were not repaid, the plaintiff attempted to

take control of the CDs, which turned out to be worthless. *See id.* The plaintiff sought recovery

under a bankers blanket bond issued by the defendant. *See id.* at 861.

The issue before the court in *Liberty Nat'l* was whether the plaintiff could prove its right to

recover under Insuring Agreements (D) or (E) in the bond. *See id.* at 862. The court noted that the

bond was not a form of credit insurance, and recognized that the bond distinguished "between the

risk of authentication (forgery and counterfeiting) against which the [plaintiff] could not reasonably

protect itself and the credit risk posed by worthless collateral." *Id.* at 866 (internal quotations

omitted). The division of risk in the bond was evidenced by the plain language of the bond when

read as a whole. *See id.* at 866.

The bond expressly excluded, through the loan loss exclusion, "loss resulting from the

complete or partial nonpayment of, or default upon ... any loan ... made or obtained from the Insured

... whether procured in good faith or through trick artifice, fraud or false pretenses unless such loss

is covered under Insuring Agreement (A), (D) or (E)." *Id.* at 861. Insuring Agreement (D) provided

the plaintiff with coverage for "loss through FORGERY OR ALTERATION of, on or in any ...

certificates of deposit ...." *Id.* at 864. Similarly, Insuring Agreement (E) protected the plaintiff

against loss through the plaintiff having relied on certain instruments containing a forgery. *See id.*

at 862. While Insuring Agreements (D) and (E) protected against risks of authentication, the loan

loss exclusion clearly excluded credit risks from coverage. *See id.* at 866. The court emphasized

"that a loss caused by fraud or false pretenses is expressly excluded from coverage by Section 2(e)

*unless*" the plaintiff could prove it qualified for coverage under Insuring Agreements (D) or (E). *Id.*

at 866-67 (emphasis in original).

Given this dichotomy, the court  concluded that the parties intended for the plaintiff to

assume the risk of its collateral being worthless, stating "the parties would expect the Bank to protect itself against the risk posed by the possible worthlessness of the CDs through its normal credit evaluation procedures." *Id.* Since the plaintiff's collateral was worthless, the court reasoned that it should bear the loss. *See id.* at 867. The court summarized its reasoning as follows:

> The bond insures that the documents submitted to the bank in connection with a loan are genuine and authentic. If they are not, and a loss is caused thereby, the bonding company guarantees the loss. On the other hand, the bonding company does not guarantee the truth of said documents. If they are not truthful, and a loss results therefrom, it is not guaranteed.
>
> The allocation of such losses undoubtedly arises from the practicality of the situation. A bank cannot protect against counterfeit and forged documents. It can, on the other hand, investigate the assertions made therein through credit checks, appraisals, title searches, financial statements and the like.
>
> In this particular case the documents relied upon were not counterfeit but may have been forged. But even if counterfeit and forged, the loss sustained by the Bank was not caused by the lack of authenticity or genuineness of the documents. On the contrary, the loss was caused by the fact that the statements contained in the documents were not true. The assets represented thereby did not exist. If the documents were authentic and their signatures genuine and authorized, the loss nonetheless would have occurred. *The failure of the security was not because they were counterfeit or forged, but solely because the assets purportedly represented thereby were non-existent. This loss falls upon the Bank and not the bonding company by the terms and intent of the bond.*

*Id.* at 863 (emphasis added). Therefore, since the plaintiff's loss was not caused by the forgery, it was not covered by the bond. *See id.* at 867. *See also* Edgar L. Neel, *Financial Institution and Fidelity Coverage for Loan Losses*, 21 TORT & INS. L. J. 590, 611 (1986) (stating that the court "understood that the bank had the ability to protect itself against the risk of the possible worthlessness of the CDs.").

Relying on the rationale of *Liberty Nat'l*, the court in *Georgia Bank* reached an identical result. There the plaintiff sought coverage under its blanket bond for losses stemming from a defunct transaction in which it loaned money against a savings account that never contained funds. *See*

*Georgia Bank*, 538 S.E.2d at 765. As collateral for a loan, the plaintiff received an assignment of a savings account at a credit union. *See id.* On two occasions the plaintiff obtained documents, purportedly from the credit union, that confirmed the account balance and that the credit union would hold it subject to the plaintiff's control. *See id.* However, the debtors had altered the account balance on these statements and forged the signature of a credit union representative. *See id.* In reality, the account was never funded and had a negative balance. *See id.*

As in *Liberty Nat'l*, the court in *Georgia Bank* concluded that the bond did not insure the plaintiff's loss because it would have suffered the same loss even if the signatures on the confirmations were genuine. *See id.* at 766. The court stated that, consistent with the allocation of risks in the bond, "the bank's responsibility to investigate the assets of its borrowers was never delegated to the insurance company." *See id.* Since the plaintiff's loss directly resulted from the worthlessness of the collateral and not from the forged signatures, the court concluded that the defendant was entitled to summary judgment. *See id.*

Similarly, in *KW Bankshares*, the court concluded that the plaintiff's loss did not result directly from a forgery when the collateral for the loan turned out to be non-existent. *See KW Bankshares*, 965 F.Supp. at 1054. There the plaintiff suffered a loss when it loaned money to a debtor based on a letter from the debtor's employer indicating that he was to receive a large bonus. *See id.* at 1049-50. However, the letter from the employer turned out to be a fabrication in that the debtor was never entitled to a bonus and the employer's signature was forged. *See id.* Following the reasoning in *Liberty Nat'l*, the court held that the plaintiff's loss did not result directly from the forgery, but from the worthlessness of the collateral. *See id.* at 1054.

The court in *KW Bankshares* concluded that this result was compelled by the "purpose of

a banker's blanket bond." *Id.* at 1054. The court explained that "the bond, like most standard banker's blanket bonds, excludes coverage for most losses resulting from nonpayment of a loan obtained through fraud or false pretenses unless the loss is specifically covered under one of the insuring agreements–it is clearly not a credit insurance policy." *Id.* The court further elaborated that a contrary result would "bind the defendant to a contract that it clearly did not enter into." *Id.* at 1055. The same concern was expressed in a similar case on which the court relied involving a letter of credit transaction, where the court stated:

> Were we to hold that [the plaintiff] could recover on a banker's blanket bond in the instant transaction, we would in effect transform the blanket bond into [a policy of credit insurance]: our decision would allow banks to rely on documents presented by a beneficiary to a letter of credit transaction not because the are worthy of reliance, *but rather because the reliability of such documents is insured*.

*Id.* (quoting *Republic Nat'l Bank of Miami v. Fidelity & Deposit Co. of Maryland*, 894 F.2d 1255, 1264 (11th Cir. 1990)) (emphasis in original). Accordingly, the court found that the plaintiff's loss was not covered by the bond where the loss resulted from the worthlessness of its collateral. *See id.* at 1054.

In this case, just as in *Liberty Nat'l*, *Georgia Bank*, and *KW Bankshares*, Flagstar extended credit based on collateral that turned out to be completely fictional. Like the CDs in *Liberty Nat'l*, the promissory notes in the present case had absolutely no value. The notes involved in this case represented that the maker promised to repay a loan. However, the loan never took place and, thus, no promise was ever made that could be enforced. Therefore, the notes were worthless because they did not represent real promises. While Flagstar claims the notes had value because they were essential to completing the credit transaction with Amerifunding, this does not mean that the notes had any worth. Flagstar essentially states that the notes had value because it valued them.

19

Undoubtedly the plaintiff in *Liberty Nat'l* valued the CDs it took as collateral also, but this did not change the fact that the CDs never existed. At most, Flagstar can show transaction causation; however, the forgeries did not cause its loss. Thus, just as in *Liberty Nat'l*, *Georgia Bank*, and *KW Bankshares*, even though the notes may have induced Flagstar to advance funds, the real cause of its loss was the fact that the assertions made in the notes were not truthful.

Flagstar also fails to recognize the similarity between the notes in this case and the CDs in *Liberty Nat'l*. A CD and a promissory note are similar in that they both represent promises to pay back money received. *See* MICHIE, BANKS AND BANKING, CH. IX § 313 (1994) (stating that a CD constitutes, in effect, a promissory note, creating a debtor/creditor relationship). The difference lies in who makes the promise. While a promissory note tends to be made by an individual, CDs are made by banking institutions. This does not change the character of what the instruments represent. Just as the CDs in *Liberty Nat'l* purportedly represented a bank's promise to repay money to a depositor, the notes in this case purportedly represented a mortgagor's promise to repay a loan to Amerifunding. *See id.* However, in both cases, no promises were ever made. The fact that the documents also contained a forged signature does not alter the reality that the promises to pay money represented in the notes or CDs were not real. Therefore, even if the signatures were genuine, the real value of the notes, i.e. the promise to pay money, still did not exist. Consequently, Flagstar's loss did not result directly from the forgery, even if the forgery may have caused Flagstar to enter into the transaction.

The Court finds that this result is consistent with the allocation of risks provided by the financial institution bond. The Bond at issue in the present case is based on the standard form bond at issue in *Liberty Nat'l*, *Georgia Bank*, and *KW Bankshares*. As in those cases, Flagstar's Bond

20

clearly allocates the risk of entering into a bad credit transaction on the insured rather than the insurer as evidenced by the loan loss exclusion. *See* 9A COUCH ON INSURANCE § 132.47 (1995) (stating the "purpose of the exclusion is to avoid the risk of writing credit insurance."). Maintenance of this distinction requires that the Bond not be construed in such a way as to provide coverage for credit risks such as the risk that collateral for a loan turns out to be worthless. As the courts in *Liberty Nat'l* and *KW Bankshares* recognized, to hold that a loss caused by the failure of collateral, which is a credit risk, is covered by the bond, would convert the bond into a form of credit insurance. As a further result, such a holding would force the insurer into an agreement which it did not enter. "To hold the loss ... [is] covered by the bond because a technical forgery had been committed would unfairly allocate the risks of the transaction in favor of" Flagstar. Neel, *supra* at 611.

Like the courts in *Liberty Nat'l*, *Georgia Bank*, and *KW Bankshares*, the Court refuses to rewrite the parties' agreement and convert the bond into a form of credit insurance. This is because an insured such as Flagstar can protect itself against credit risks through its normal credit evaluation procedures. As the court in *Liberty Nat'l* noted, financial institutions have the means and experience to evaluate their debtors' ability to repay loans and to appraise collateral. In that case, the insured could have run credit checks, contacted the bank in the West Indies to find out if the CDs actually existed, and requested that the bank follow its instructions with regard to the CDs. Similarly, in the present case, Flagstar could have easily verified the existence of the underlying mortgage transactions that were the basis of its collateral by investigating whether the mortgages were actually recorded, investigating the creditworthiness of the underlying borrowers, or maintaining strict

control over the title company to which it entrusted the funds prior to closing the transactions.[3]

The Court finds Plaintiff's cases unpersuasive. In contrast to *Liberty Nat'l*, *Georgia Bank*, and *KW Bankshares*, the court in *Jefferson Bank* left the issue of whether the plaintiff's loss resulted directly from a forgery to the jury, finding a genuine issue of material fact on causation. *See Jefferson Bank*, 965 F.Supp. at 1285. The plaintiff in *Jefferson Bank* loaned money to a debtor in exchange for a mortgage. *See id.* at 1275. As it turned out, the mortgage documents bore a forged notary's signature. *See id.* Further, the debtor had used the same property as collateral for other loans as part of a scheme to defraud banks. *See id.* Finally, the plaintiff failed to record its mortgage and, as a result, fell in the order of priority. *See id.* The court found that the mortgage had theoretical value because the plaintiff could have recorded it before losing priority or could have sued the defendant immediately for a breach of warranty. *See id.* at 1283. Thus, the collateral in *Jefferson Bank* is distinguishable from that in the present case because it had value at the time of the loan. Consequently, the court in *Jefferson Bank* could not say that the forgeries did not cause the collateral to lose value.

Illustrative of the distinction between collateral that is fictional and collateral that subsequently loses value is the court's analysis in *St. Paul Fire & Marine Ins. Co. v. Bank of Stockton*, 213 F.Supp. 716 (N.D. Cal. 1963). There, a bank loaned money to a third person based on a guarantee signed by a husband as a guarantor. *See id.* at 717. However, because California was a community property state, the wife's signature was necessary to make the guarantee effective. *See id.* The bank allowed the husband to take the guarantee form home in order to procure his wife's

---

[3]A similar safeguard was the basis of traditional warehouse lending. *See* Murdoch K. Goodwin, *Mortgage Warehousing–A Misnomer*, 104 U. PA. L. REV. 494 (1956). There the lending institution would actually take control of the facility holding its collateral, ensuring that its investment was protected. *See id.* at 496.

signature. *See id.* Instead, the husband forged his wife's signature and returned to the bank, which then disbursed the loan. *See id.* When the debtor defaulted, the bank attempted to collect based on the guarantee but because the wife's signature was forged, the guarantee was ineffective and the bank suffered a loss, which it attempted to recover under its blanket bond. *See id.* The court concluded that the loss was covered because the guarantee had value at the time of the loan because the guarantors had assets to back up the guarantee, and was ineffective only because of the forgery. *See id.* at 718. Unlike *Jefferson Bank* and *Stockton*, Flagstar's collateral never had value because it was completely fictional, and it cannot be said that it lost value because of the forgery.

The Court finds that Flagstar's reliance on the result in *Omnisource* is misplaced. *Omnisource* involved a letter of credit transaction, which is structured differently than mortgage warehousing. *See Omnisource*, 949 F.Supp. at 682-83. Under a letter of credit transaction, "the buyer ... applies [to its bank] for issuance of an irrevocable letter of credit which commits [the] bank ... to pay a draft drawn by the seller upon proper presentation of the draft and any documents required by the letter of credit." *Id.* at 683 fn. 2. The plaintiff in *Omnisource* was a buyer of scrap metal and not a lending institution like Flagstar or any of the plaintiffs in the cases cited by Federal. *See id.* at 682. Consequently, the plaintiff had virtually no way of preventing the bank from paying the seller upon receipt of ostensibly genuine bills of lading. Thus, the allocation of risks in the transaction in *Omnisource* was completely different from that in the present case. Not surprisingly, the parties in *Omnisource* used a completely different form of bond. *See id.* at 684. The plaintiff in *Omnisource* was allowed to recover precisely because the structure of the underlying transaction placed the risk of receiving forged documents on the insurer because the plaintiff did not have the ability to protect itself.

23

Similarly, the Court concludes that the result in *First Federal* is unpersuasive. In *First Federal*, the plaintiff financed the construction of two buildings. *See First Federal*, 768 F.Supp. at 1451. As part of the financing, the plaintiff would release funds to the buildings' general contractor upon receipt of several documents, including checks that contained forged lien waivers. *See id.* In reality, the general contractor embezzled the funds. *See id.* When the general contractor defaulted on the loans, the plaintiff took possession of the buildings subject to several claims of the subcontractors, which it subsequently paid. *See id.* at 1451-52. The plaintiff then attempted to recover these payments from its insurer under a financial institution bond. *See id.* The court found that lien waivers were forgeries and the checks were covered instruments under the bond. *See id.* at 1452. However, the court could not say that the plaintiff's loss did not result directly from the forgeries and provided no analysis of the causation issue. *See id.* at 1455. Further, unlike the present case, the plaintiff's collateral in *First Federal* had value and it would not have sustained the same loss had the lien waivers been genuine.

In addition, *First Federal* actually refutes Plaintiff's causation argument by distinguishing between Insuring Agreement (D)(1) and those agreements that require reliance. *See id.*; *accord First Nat'l Bank in Manitowoc v. The Cincinnati Ins. Co.*, 2005 WL 2460719 (E.D. Wis. 2005) (stating Insuring Agreement (D)(1) covers losses resulting directly from forgery rather than loss from any negotiable instrument that proves to be forged). Under Insuring Agreement (D)(1), and Insuring Clause 4 under which Flagstar seeks coverage, there is no element of reliance. *See First Federal*, 768 F.Supp. at 1455. That is, the loss must be caused directly by the forgery rather than by the insured's reliance on documents that contain forgeries. By omitting the intervening element of reliance, Insuring Agreement (D)(1) and Insuring Clause 4 in this case contemplate a closer nexus

24

between the forgery and the loss. Therefore, *First Federal* does not compel the Court to reach a different result.

Moreover, the Court is not persuaded by Plaintiff's argument that the Bond in the present case provided broader coverage than a standard bond. Plaintiff claims that the Bond in question omitted the loan loss exclusion and thus, provided Plaintiff with broader coverage than other similar bonds. However, this is not true. The Bond does include the loan loss exclusion in virtually the same form as the Standard Form Bond. As with loan loss exclusion 2(e) of the Standard Form Bond, the exclusion in the present Bond excludes all loan losses unless they are covered by Insuring Clauses 1, 4 or 5. There is no substantive difference between the two exclusions despite the difference in wording and placement in the Bond. Therefore, Plaintiff's argument is without merit.

Finally, the proximate cause analysis in Plaintiff's cases is flawed because it ignores the plain language of the bonds at issue requiring that the loss result directly from the forgery. The cases upon which Plaintiff relies inexplicably rely on tort concepts to define an unambiguous term in an insurance contract. Specifically, in *Jefferson Bank*, the court first acknowledged that "direct cause" implies a closer nexus between the forgery and the loss than mere proximate cause. *See Jefferson Bank*, 965 F.Supp. at 1281. The court then disregarded the plain language of the bond and construed "direct cause" to mean "proximately caused by." *See id.* This unnecessary construction was inconsistent with principles of contract interpretation, and defeated the purpose of the financial institution bond by essentially requiring the insurer to bear credit risks. As stated before, the Court will not rewrite the parties' agreement. *See* Haley, *Paradigms of Proximate Cause*, *supra* at 164 (arguing against injecting tort concepts of causation into duly negotiated insurance contracts). Both Flagstar and Federal are large, sophisticated financial institutions. They are well aware of the risks

25

of the transactions in which they are involved and can easily bargain with each other to allocate those risks. Both parties knew that the Financial Institution Bond was not a form of credit insurance, and Flagstar was perfectly capable of bargaining for insurance against the risk posed by worthless collateral. Consequently, its loss is not covered by the Bond at issue in this case and, therefore, Federal's Motion for Summary Judgment is GRANTED.

### V. CONCLUSION

The Court finds that there is no genuine issue of material fact that Flagstar's loss did not result directly from the forgeries on the promissory notes submitted by Amerifunding. As a result, the Financial Institution Bond does not cover Flagstar's loss in this case. Accordingly, Federal's Motion for Summary Judgment is GRANTED.

The Court notes that Flagstar's Motion to Strike Affirmative Defenses (Docket # 141) and Motion to Amend Portions of the Current Scheduling Order (Docket # 135) are still outstanding. In light of the resolution of the current motion, Flagstar's outstanding motions are moot and are HEREBY DENIED. Therefore,

IT IS ORDERED that Federal's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Flagstar's complaint is HEREBY DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Flagstar's Motion to Strike Affirmative Defenses and Motion to Amend Portions of the Current Scheduling Order are DENIED.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  November 17, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on November 17, 2006.

S/Marie E. Verlinde
Case Manager
(810) 984-3290